IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL KENNETH HENDRICKS, | ) | CASE NO. 1:16-cv-00168 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Michael Kenneth Hendricks ("Plaintiff" or "Hendricks") seeks judicial review of

the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his

applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits

("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has

been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to

Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM**

the Commissioner's decision.

## I.  Procedural History

Hendricks filed applications for DIB and SSI on May 31, 2012.  Tr. 61, 73, 112, 190-191,

192-197.   He alleged a disability onset date of  February 18, 2011 (Tr. 86, 98, 112, 192, 212)

based on mental impairments, including bipolar disorder, schizoaffective disorder, and

depression (Tr. 62, 74, 86, 98, 130, 134, 142, 146, 217).  After initial denial by the state agency

(Tr. 130-136) and denial upon reconsideration (Tr. 142-153), Hendricks requested a hearing (Tr.

1

154-155).  A hearing was held before Administrative Law Judge Scott R. Canfield ("ALJ") on

December 10, 2013.  Tr. 10-60.

In his August 19, 2014, decision (Tr. 109-129), the ALJ determined that Hendricks had

not been under a disability from February 18, 2011, the alleged onset date through the date of the

decision.  Tr. 112, 124-125.  Hendricks requested review of the ALJ's decision by the Appeals

Council.  Tr. 7-8.  On January 7, 2016, the Appeals Council denied Hendricks's request for

review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A. Personal, educational, and vocational evidence

Hendricks was born in 1978.  Tr. 16, 123, 192, 212.   At the time of the hearing,

Hendricks was living by himself in a condominium owned by his mother.  Tr. 17, 46.  He was

not married and had no children.  Tr. 17.   Hendricks has a bachelor's degree in graphic design

and an associate's degree in illustration.  Tr. 19.  Hendricks last worked as a graphic designer

and was terminated from that job on February 18, 2011.  Tr. 19, 53, 119, 231.  After being let go

in February 2011, Hendricks continued to look for work and received several interviews.  Tr. 20,

119.

### B. Medical evidence

#### 1. Treatment records

Hendricks and the Commissioner agree that there is no dispute regarding Hendricks's

mental health treatment history and diagnosis of paranoid schizophrenia prior to his alleged onset

date.  Doc. 11, p. 5; Doc. 14, p. 2; Tr. 431, 448, 452, 469.  Thus, the focus of the parties'

summary of the medical evidence is on the period shortly before and following Hendricks's

alleged onset date.

From November 11, 2010, until November 24, 2010, Hendricks was hospitalized in Marymount's psychiatric unit.  Tr. 431, 437.  He was supposed to be taking Risperdal and Abilify but had not been taking his medication for one year.  Tr. 431.  Reported behaviors leading up to his hospitalization included being very paranoid at home; not sleeping; thinking that somebody had stolen his identity; not feeling safe in public; having some hallucinations; and hearing the devil and god fighting on the radio.  Tr. 431.  On November 26, 2010, Hendricks saw Dr. Shila J. Mathew, M.D., for follow up after being released from the hospital.  Tr. 430-432.  Dr. Mathew noted a diagnosis of paranoid schizophrenia, with a recommendation to continue with his medications, which included Risperdal, Seroquel, and Cogentin, and return for follow up in one week.  Tr. 432.

Hendricks continued to see Dr. Mathew for follow up and, on January 3, 2011, Dr. Mathew noted that Hendricks was released to return to work on January 17, 2011.  Tr. 448.  Dr. Mathew observed that Hendricks was cooperative and alert, he was not depressed, he was not delusional, he had no hallucinations, he had no cognitive deficits, his affect was flat, and his insight and judgment were poor.  Tr. 448.

On or about January 15, 2011, Hendricks saw psychologist Dr. Mary K. Benton, Ph.D.. Tr. 449-452.  Dr. Benton's impression was that Hendricks was doing much better and was ready to return to work.  Tr. 451.  Dr. Benton noted that she was continuing to diagnosis Hendricks with schizoaffective disorder because of the report of past manic episodes but that schizophrenia remained as a possible diagnosis.  Tr. 451.

On February 17, 2011, Hendricks saw Dr. Mathew for follow up.  Tr. 452-456. Hendricks had returned to work and reported that he was doing well and was able to focus on his work.  Tr. 454.  He did not feel paranoid and felt comfortable at work.  Tr. 454.  He was working

on projects and was able to do as well as he had before.  Tr. 454.  Dr. Mathew observed that

Hendricks was cooperative and alert, he was not depressed, he was not delusional, he had no

hallucinations, he had no cognitive deficits, his affect was flat, and his insight and judgment were

poor.  Tr. 454.  Dr. Mathew recommended follow up in two months.  Tr. 455.

On March 7, 2011, Hendricks saw Dr. Benton.  Tr. 457-459.  Hendricks reported that he

had been laid off from his job the prior Friday because of the economy not because he had done

anything.  Tr. 458.  Hendricks had been down a little because of losing his job but his mood had

stayed relatively even.  Tr. 458.  His appetite was stable and his sleep was "very restful – maybe

a bit too much." Tr. 458.  Dr. Benton observed that Hendricks was dressed appropriately, his

hygiene was good, his affect was appropriate; his mood was euthymic; there was no evidence of

psychosis; his thought process was logical and coherent; and his insight and judgment were fair.

Tr. 458.

During an April 18, 2011, follow-up visit with Dr. Mathew (Tr. 460-463), Hendricks

relayed that being laid off from his job had come as a surprise (Tr. 461).  He was angry at first

but was able to let go.  Tr. 461.  Other employees were also laid off.  Tr. 461.  Hendricks had

been compliant with his medication and had not any recurrence of symptoms since his Risperdal

dose was lowered.  Tr. 461.  Hendricks's mother had purchased a condo for him because they

were worried about him being homeless.  Tr. 461.  He was looking for a job.  Tr. 461.  During

the visit with Dr. Mathew, Hendricks was calm and appropriate with no thought disorder.  Tr.

461.  He was not depressed or delusional and he had no hallucinations.  Tr. 461.  His affect was

flat.  Tr. 461.  He had no cognitive deficits but Dr. Mathew noted that Hendricks's insight and

judgment were poor.  Tr. 461.  Dr. Mathew continued his diagnosis of schizophrenia, paranoid.

Tr. 462.  Dr. Mathew lowered Hendricks's Seroquel, continued all other medications, and recommended follow up in three months.  Tr. 462.

In July 2011, Hendricks saw Dr. Mathew and reported that he was doing fine on the lower dose of Seroquel.  Tr. 464-465.  Hendricks was not paranoid, his thought process was clear, and he was active and running every day.  Tr. 465.  Hendricks was continuing to look for a job but had not had any luck.  Tr. 465.  Mental status findings similar to those noted during Hendricks's April 2011 visit with Dr. Mathew were observed and noted.  Tr. 465.  Dr. Mathew concluded that Hendricks was stable and the recommended plan was to have Hendricks continue on his current medications.  Tr. 465.

Hendricks saw Dr. Mathew again in December 2011.  Tr. 467-470.  Hendricks continued to be compliant with his medication with no side effects.  Tr. 468.  Hendricks denied delusions, paranoia, mood swings, and racing thoughts.  Tr. 468.  At times, Hendricks felt down and depressed because of his inability to find a job.  Tr. 468.  His parents were helping him financially.  Tr. 468.  He had started to expand his job search to include data entry and other entry level jobs.  Tr. 468.  Nevertheless, Hendricks remained stable and, because he was doing well, Dr. Mathew lowered Hendricks's Risperdal dose.  Tr. 468.  Dr. Mathew observed that Hendricks was cooperative and alert, his speech was normal and appropriate, he was not depressed, he was not delusional, he had no hallucinations, and he had no cognitive deficits.  Tr. 468.  Dr. Mathew also observed that Hendricks's affect was flat and his insight and judgment were poor.  Tr. 468.

Hendricks saw Dr. Mathew in August 2012 for follow up.  Tr. 484-487.  Hendricks was compliant with his medication.  Tr. 485.  Since having lowered his Risperdal dose, Hendricks had not had a recurrence of delusions.  Tr. 485.  He was having difficulty falling asleep once a

week.  Tr. 485. Once asleep, he was getting a good 8 hours of sleep.  Tr. 485.  Hendricks's

mother attended the visit and did not report observing any symptoms.  Tr. 485.  Dr. Mathew

observed that Hendricks was cooperative and alert, his speech was normal and appropriate, he

was not depressed, he was not delusional, he had no hallucinations, and he had no cognitive

deficits.  Tr. 485.  As he had observed before, Dr. Mathew observed that Hendricks's affect was

flat and his insight and judgment were poor.  Tr. 485.  Dr. Mathew assessed Hendricks as stable

and he lowered Hendricks's Risperdal and continued the rest of his medications.  Tr. 485-486.

 Hendricks saw Dr. Mathew again at the end of January 2013.  Tr. 487-490.  Hendricks

reported weight gain from his medication.  Tr. 488.  He was compliant with his medication but

reported two instances of paranoia.  Tr. 488.  He explained he was at a store and felt that people

in the store were watching him.  Tr. 488.  Hendricks reported that he occasionally felt down but

was not depressed at the time of his visit with Dr. Mathew.  Tr. 488.   When he feels down,

Hendricks explained that he has low motivation and does not do anything.  Tr. 488.  Hendricks

indicated that these instances occur about one or twice a month and last about two days.  Tr. 488.

He was sleeping well and denied mood swings.  Tr. 488.   Hendricks was continuing to look for a

job.  Tr. 488.  Dr. Mathew noted that Hendricks's hygiene was poor.  Tr. 488.  Dr. Mathew also

noted that Hendricks was alert, oriented and cooperative; his speech was normal and appropriate;

he was not depressed or delusional; and he had no hallucinations and no mood swings.  Tr. 489.

As he had observed before, Dr. Mathew observed that Hendricks's affect was flat and his insight

and judgment were poor.  Tr. 489.  Dr. Mathew assessed Hendricks as stable and continued his

medications.  Tr. 489.  He encouraged Hendricks to maintain better hygiene and exercise to keep

his weight down.  Tr. 489.  Dr. Mathew indicated that Hendricks's depressive symptoms were

not severe or had not lasted long enough to start him on any medication.  Tr. 489.  Dr. Mathew advised Hendricks to call him if his symptoms got worse.  Tr. 489.

On September 6, 2013, Hendricks underwent a Mental Health Assessment at MetroHealth conducted by Adrian Jurkiw, LISW.  Tr. 491-496.  Hendricks's chief complaint was that he was diagnosed with paranoid schizophrenia and needed medication.  Tr. 491.  He relayed that he had 11 days of medication left and he no longer had insurance to cover the physician that had prescribed him the medication.  Tr. 491.  Hendricks reported past instances of a depressed mood, with the most recent having been Christmas of 2012.  Tr. 491.  He was not depressed at the time of his visit.  Tr. 491.  Hendricks reported some recent weight loss but was not sure how much.  Tr. 491.  Hendricks also reported feeling excessive anxiety when he is in large crowds. Tr. 492.   When he starts to feel anxiety coming on, he will go to his condo to get some space.  Tr. 492.  Hendricks indicated that he finds it difficult to control his worrying.  Tr. 492.  Hendricks reported a history of having hallucinations when he is in a paranoid state.  Tr. 492.   He indicated he experienced a hallucination the prior week while he was going to the library.  Tr. 492.  Hendricks relayed that he had not had an increase in his symptoms but just needed to get his medication.  Tr. 492.   Ms. Jurkiw observed that Hendricks was adequately groomed and cooperative.  Tr. 495.  Hendricks's speech was clear and coherent; his thought process was logical and organized; and his judgment and insight was fair.  Tr. 495.  Hendricks's goal was to get seen by a psychiatrist.  Tr. 495.  Ms. Jurkiw's diagnostic impression was schizophrenia, paranoid type (by patient report and history) and social phobia.  Tr. 496.  Ms. Jurkiw recommended that Hendricks be linked with a psychiatrist, preferably at MetroHealth's main campus.  Tr. 496.

A few weeks later, on September 20, 2013, Hendricks was seen by Leslie Powell, MSW, RN, PMHNP-BC, of MetroHealth for a Mental Health Assessment Update with Pharmacologic Management.  Tr. 501-505.  Hendricks's mood had been relatively good.  Tr. 502.  He had been more energetic lately.  Tr. 502.  He reported instances of paranoia every now and then.  Tr. 502.  He goes to the grocery store early in the day to avoid crowds.  Tr. 502.  Hendricks reported that he had been isolating himself lately in his condo.  Tr. 502.  He walks about 30 minutes daily for exercise.  Tr. 502.  He indicated he has family in Australia that he visits occasionally.  Tr. 502.  Ms. Powell noted that Hendricks denied audio and visual hallucinations and there was no evidence of delusional thought content.  Tr. 503.  Hendricks's memory and cognition appeared grossly intact; his insight was fair; and his judgment was good.  Tr. 503.  Ms. Powell assessed paranoid schizophrenia; cocaine dependence in remission; and marijuana dependence in remission.  Tr. 504.  She continued Hendricks's prescriptions for Seroquel, Risperdal, and Cogentin.  Tr. 505.

Hendricks saw Ms. Powell again on October 18, 2013, for pharmacologic management.  Tr. 515-517.  Hendricks reported that things were going well.  Tr. 515.  He had recently traveled to Pennsylvania to see his family because his father was in the country from Australia.  Tr. 515-516.  Hendricks's mood had been pretty stable.  Tr. 516.  He was a little manic while at his grandmother's house which he associated with increased activity during his family visit.  Tr. 516.  Also, while he was waiting for a connecting flight in Philadelphia, there was a fire alarm in the airport which made him feel "uptight."  Tr. 515.  Ms. Powell observed no evidence of paranoia, delusions or perceptual disturbance.  Tr. 516.  Hendricks's mood was euthymic; his affect was constricted; his attention/concentration was grossly intact and his judgment and

insight were fair.  Tr. 516.  Ms. Powell continued Hendricks on his medications at the then

current doses and recommended follow up in two months.  Tr. 517.

### 2.    Opinion evidence

#### a.    Treating psychiatrist

On November 26, 2012, Dr. Mathew completed a questionnaire setting forth her opinions

regarding Hendricks's mental impairments.  Tr. 480-482.  Dr. Mathew noted she first saw

Hendricks on November 26, 2010, and last saw him on August 24, 2012.  Tr. 480.  Dr. Mathew

diagnosed Hendricks with schizophrenia, paranoid type.  Tr. 482.   Dr. Mathew indicated that,

with medication, Hendricks's paranoia had subsided but Hendricks still had issues with

concentration and he was not able to tolerate stress and needed ongoing treatment with

medication.  Tr. 481.   With respect to Hendricks's ability to tolerate stress, Dr. Mathew

explained that Hendricks was not able to handle long hours of work or stress.  Tr. 482.

Dr. Mathew indicated that Hendricks could not tolerate crowds or groups of people.  Tr.

481.  Also, Dr. Mathew reported that Hendricks had limitations with social interactions because

of his paranoia and suspiciousness, noting that Hendricks's ability to trust others completely and

work with them needed to be re-assessed.  Tr. 481.  Hendricks's last episode was in November

2010 when he was severely psychotic.  Tr. 482.  Dr. Mathew stated that Hendricks's "symptoms

are under control now.  However not sure, how he would do if he return[ed] back to work.  Not

sure if he can work full time."  Tr. 482.  Dr. Mathew indicated that Hendricks's response to

treatment had been good.  Tr. 482.

#### b.    Consultative examining psychologist

On August 1, 2012, clinical psychologist Richard N. Davis, M.A., conducted a

consultative psychological examination.  Tr. 472-478.  Mr. Davis's diagnostic assessment was

schizophrenia, paranoid type, chronic.  Tr. 476.  Mr. Davis noted that Hendricks indicated that his only stress at that moment was not having a job.  Tr. 476.  Hendricks relayed that he was taking his medication and felt he would be capable of working at a low stress job.  Tr. 476.  Mr. Davis indicated that he saw nothing in Hendricks's behavior during the examination that would stand in the way of Hendricks being employed.  Tr. 477.  Also, Mr. Davis observed that Hendricks would be capable of relating satisfactorily towards others so long as he continued with his medication.  Tr. 477.  Mr. Davis did note that Hendricks's appearance/grooming needed improvement, noting for example that Hendricks had a strong body odor.  Tr. 474, 477.  Mr. Davis indicated that Hendricks's prognosis was dependent upon his continuing with his medication and, if he continued with his medication and remained stable, the prognosis was good that he would eventually find employment.  Tr. 478.

### c.      State agency reviewing psychologists

State agency reviewing psychologist Bonnie Katz, Ph.D., completed a Psychiatric Review Technique (Tr. 66-67) and Mental RFC Assessment (Tr. 68-69).  In the Psychiatric Review Technique, Dr. Katz concluded that Hendricks had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation.  Tr. 66.  In the Mental RFC, Dr. Katz found no understanding or memory limitations.  Tr. 68.  Dr. Katz found limitations in sustained concentration and persistence, limitations in social interactions, and adaptation limitations.  Tr. 68-69.  Dr. Katz opined that Hendricks had the RFC to perform at least simple, routine tasks without high or fast-paced production demands; make simple decisions; have at least superficial interactions as long as compliant with medications; and adapt to occasional changes in routine. Tr. 68-69.

Upon reconsideration, on December 18, 2012, state agency reviewing psychologist Vicki Warren, Ph.D., completed a Psychiatric Review Technique (Tr. 91) and Mental RFC Assessment (Tr. 92-94).  In the Psychiatric Review Technique, Dr. Warren concluded that Hendricks had mild restrictions in activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and no repeated episodes of decompensation.  Tr. 91.  In the Mental RFC, Dr. Warren found no understanding or memory limitations and no adaptation limitations.  Tr. 93.  Dr. Warren found limitations in sustained concentration and persistence and limitations in social interactions but opined that Hendricks was stable on his medication and had the ability to handle all his daily needs independently.  Tr. 93. She further opined that, although Hendricks did not respond well to stress, he would be able to deal with a job where production quotas are not strict and work pace is not rapid.  Tr. 93.  Also, Dr. Warren opined that Hendricks should not work with the public because he did not tolerate crowds or groups of people.  Tr. 94.

## C.      Hearing testimony

### 1.       Plaintiff's testimony

Hendricks testified and was represented at the hearing.  Tr.  16-39, 48-49, 50-52, 54-55. Hendricks estimated that he had gained at least 85 pounds since his alleged onset date of February 18, 2011, which he attributed to his medication.  Tr. 17.  Hendricks indicated he did not have a driver's license.  Tr. 17.  He stated he has a fear of driving.  Tr. 18.  Until about 2007, he had a driver's license.  Tr. 18.  He lost his license once because of a DUI, got it reinstated for a bit, but then moved to Australia and let it lapse.  Tr. 18.  Hendricks's mother drove him to the hearing.  Tr. 18.

When questioning Hendricks, the ALJ observed that, when Hendricks does not take his medication, he is very productive at work and performs better at his job, which causes him to not want to take his medication.  Tr. 19.   However, when he is not taking his medication, he ends up getting in trouble.  Tr. 18-19.   Hendricks indicated that, before he lost his last job, he was hospitalized and came back to work for about a month but had problems doing his work.  Tr. 20.  Then, he ended up losing his job.  Tr. 20.   When employed, Hendricks indicated that he did have problems getting along with both his bosses as well as coworkers.  Tr. 54-55.  People he worked with would irritate him or rub him the wrong way.  Tr. 55.

Hendricks's medications include Benzatropine, Risperdal, and Seroquel.  Tr. 22.  When Hendricks is taking his medication he is slower, lethargic, and not as precise or efficient.  Tr. 26.  Thus, when working on particular jobs in the past, Hendricks felt more productive and precise if he was not taking his medication.  Tr. 26-27.  He also experiences insomnia, causing him to have at least two nights a week when he usually does not sleep.  Tr. 26. When he is able to sleep, he tries to get six hours each night.  Tr. 26.  He would prefer to get eight hours of sleep each night.  Tr. 26-27.   Following a sleepless night, Hendricks feels fatigued mentally.  Tr. 34.  He might nap for two or three hours but he often tries to force himself to stay up so he can try to go to bed at a normal time.  Tr. 30.  Hendricks indicated that his symptoms are worse when he has not slept.  Tr. 34.

The last time that Hendricks was not compliant with his medication was 2011.  Tr. 22.  Hendricks indicated that his last experience in the hospital was so terrible.  Tr. 22.  It was the worst experience of his life and "scared [him] straight in terms of taking [his] meds."  Tr. 22.  Although compliant with his medication, Hendricks feels he is unable to work because he experiences paranoia when he is out in public.  Tr. 22.  He has relayed this information to his

12

treating doctor and they have tried adjusting his medication dosages but the paranoia has been something that just always existed.  Tr. 22-23.  Hendricks's paranoia is much worse, though, when he is not on his medication.  Tr. 23.  When not on medication, Hendricks has had visual hallucinations.  Tr. 23.  Hendricks indicated he has always had auditory hallucinations.  Tr. 23.  Medication reduces the number of Hendricks's auditory hallucinations but does not eliminate them entirely.  Tr. 24-25.  His auditory hallucinations are off and on and tend to come with the paranoia.  Tr. 23.  Hendricks has auditory hallucinations just about every time he goes out in public.  Tr. 36.  He estimated hearing voices one or two times each week.  Tr. 36.  He explained that his auditory hallucinations involve his belief that people are talking about him.  Tr. 32, 36-37.  There are times that Hendricks hears voices and gets to a point where he does not feel safe and has to go home right away to be in a safe place.  Tr. 37.  Eventually, the voices will dissipate but they might last for two to four hours.  Tr. 37.  When asked whether someplace other than home, such as a bathroom, could be a "safe place," Hendricks indicated no.  Tr. 37.  He explained that he was recently in the Philadelphia Airport and became very afraid.  Tr. 37-38.  He went to the bathroom three or four times.  Tr. 38.  He was really uncomfortable and just going into the bathroom did not stop his symptoms.  Tr. 38.  Hendricks avoids listening to music because it causes delusions.  Tr. 25.  When home, Hendricks generally feels safe.  Tr. 24.

Hendricks leaves his home at least three times a week.  Tr. 25.  As long as Hendricks's public outings occur during times when there are not a lot of people, he usually does not experience too many symptoms.  Tr. 32.

Hendricks is able to do most of his household chores but gets distracted along the way.  Tr. 25.  Doing laundry causes him problems because there are usually a lot of people in the laundry room.  Tr. 25, 32-33.  Hendricks indicated that, on a typical day, he gets up around 9:00

a.m., makes some breakfast, and takes a walk around 10:30 or 11:00 a.m.  Tr. 28-29.  He reads a

lot during the day.  Tr. 28.  Hendricks used to be able to read a lot faster than now.  Tr. 33-34.

He gets distracted mentally and sometimes has to read a page multiple times.  Tr. 33.  He uses

the internet.  Tr. 29.  He will make lunch and, if he has to go grocery shopping, he usually goes

around 2:30 p.m. when there are not a lot of people there.  Tr. 29.  Sometimes, he will go to the

Cleveland Public Library downtown.  Tr. 29.  If he goes to the library, he usually goes mid-

afternoon because there are not a lot of people there at that time.  Tr. 29-30.  He prefers the

Cleveland Public Library over the Lakewood Public Library because there are more shelves and

less open space at the Cleveland Public Library.  Tr. 29-30.  Hendricks will eat dinner and then

he will watch some shows on his computer.  Tr. 31.  He has a television but does not have cable.

Tr. 31.  Hendricks likes to read before bed and usually tries to go to bed around 11:00 p.m.  Tr.

31.

Hendricks sees some friends socially.  Tr. 48-49.  They usually just visit in someone's

apartment and talk or watch television.  Tr. 49.  They do not hang out in restaurants or bars.  Tr.

49.

Hendricks uses public transportation.  For example, he takes the bus to the library.  Tr.

30.  Whether or not Hendricks has problems with taking the bus is dependent on how many

people are on the bus.  Tr. 30.  The more crowded a bus is, the more difficult it is for him to take

the bus.  Tr. 30.  Hendricks's doctor has worked with him to try to block out the paranoia.  Tr.

30.  For example, one technique is to close his eyes or look down but, when he is on the bus, he

really cannot do that because he has to know where he is at.  Tr. 30.  There have been times

when Hendricks has taken a look at a particular bus and chosen not to get on it but to wait for

another bus.  Tr. 33.  Also, there have been times when Hendricks has gotten off a bus earlier

than his designated stop because people on the bus were being louder than normal and he felt extremely uncomfortable.  Tr. 33.

Following the loss of his job in 2011, Hendricks has continually looked for work.  Tr. 19-20.  Hendricks has gotten several interviews but has not found a job.  Tr. 20.  Hendricks believes that he has some limitations due to his disability and it has affected his job performance.  Tr. 20-21.  Hendricks does not think that he would be able to work full-time because his symptoms disrupt his daily life too much for him to work in a deadline driven work environment that he is used to working in.  Tr. 34.  Hendricks indicated that he used to work over 40 hours a week and his insomnia would make such a schedule very difficult.  Tr. 34.

Hendricks acknowledged a past history of drug and alcohol abuse.  Tr. 48.  He last used drugs in 2007.  Tr. 48.  He drinks socially with friends about once a month.  Tr. 48.

### 2.      Jody C. LaForte's testimony

Hendricks's mother, Jody C. LaForte, testified at the hearing.  Tr. 39-48.  Ms. LaForte indicated that she believed that her son was unable to work full-time because his past medication non-compliance and attempts to self-medicate with substances resulted in changes in his ability to focus and carry on conversations and take care of his daily living activities, such as managing his money, paying his bills, doing daily chores, and taking care of himself.  Tr. 40-41.  Since being compliant with his medication, Ms. LaForte has noticed that her son has been more stable than before and it has been like getting to know her son again.  Tr. 41.  While on his medication, Ms. LaForte has observed difficulties with her son's ability to concentrate and he also does not have the same kind of energy that he did as a younger adult.  Tr. 41-42.  Hendricks has recently started to talk to his mother about his paranoia.  Tr. 42.  Ms. LaForte believes that Hendricks had

not talked to her until recently about his paranoia because he was trying to protect her from knowing it was going on.  Tr. 42.

Ms. LaForte indicated that her son had been creative since he was a child and she was not surprised he pursued the type of work that he did.  Tr. 42-43.  She feels that the work that her son is good at doing comes with the pressure of deadlines.  Tr. 43.  She feels that if he was able to make art at his own pace, he could manage.  Tr. 43, 47.  Ms. LaForte sees her son having difficulty completing any task, even stocking shelves at a grocery store.  Tr. 46.  Based on what she has learned about her son's illness, she does not have much hope "that there will be anything other than a downward trajectory."  Tr. 47.

Ms. LaForte helps Hendricks occasionally by doing his laundry and some occasional cleaning of his apartment.  Tr. 43.  Ms. LaForte made the decision to purchase a condominium for her son so he would be safe.  Tr. 46.  Although her son has had issues with medication compliance in the past, she indicated that things had been different over the prior three years and she believes her son when he says he is taking his medication and also when he talks about how important he knows taking his medication is for him to have any kind of future.  Tr. 45.

### 3.      Vocational expert's testimony

Vocational Expert Deborah Lee ("VE") testified at the hearing.  Tr. 49-50, 53-54, 55-58. The VE described Hendricks's past work as including work as: (1) a graphic artist, a sedentary, skilled (SVP 7)[1] position; (2) an art director, a sedentary, highly skilled (SVP 8) position; and (3) production manager, advertising, a sedentary, skilled (SVP 7) position.  Tr. 53.  The VE indicated that the DOT did not really have a web designer position.  Tr. 53.  However, based on

---

[1] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT.  *Id.*

the VE's experience, she indicated that the position would be a sedentary, skilled (SVP 7) position.  Tr. 53.

The ALJ asked the VE to consider a hypothetical individual with no exertional and no postural limitations who is limited to simple to more complex tasks (SVP 1 - SVP 3, with a little bit more in the low semi-skilled area), with no fast-paced work, no strict production quotas, minimal changes in the work setting, and limited to occasional contact with coworkers and supervisors and no direct work-related contact with the public.  Tr. 54, 55.   The VE indicated that the described individual would not be able to perform Hendricks's past work because of the SVP levels.  Tr. 55.   The VE indicated that there would be jobs that the hypothetical individual could perform, including (1) industrial cleaner, a medium, unskilled (SVP 2) job; (2) file clerk, a light, semi-skilled (SVP 3) job; and (3) mail clerk in a non-governmental setting, a light, unskilled (SVP 2) job.[2]  Tr. 56.

Hendricks's counsel then asked the VE whether there would be jobs available to the described individual if the individual was limited to jobs with no production quotas at all, i.e., jobs with no expectation of performance.  Tr. 57.  The VE indicated that all jobs have an expectation of performance so there would be no jobs available to an individual with such a limitation.  Tr. 57.

Hendricks's counsel also asked whether there would be jobs available to the  individual described by the ALJ in his hypothetical if that individual would miss a half day at least two or three times a month on an unscheduled basis in order to get to their safe place.  Tr. 57.   The VE indicated that there would be no jobs available.  Tr. 58.

---

[2] The VE provided job incidence data for each of the jobs identified.  Tr. 56.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled

if, based on his vocational factors and residual functional capacity, he is
capable of performing other work that exists in significant numbers in the
national economy.

20 C.F.R. §§ 404.1520, 416.920;[3] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d

119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof

at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

### IV. The ALJ's Decision

In his August 19, 2014, decision, the ALJ made the following findings:[4]

1. Hendricks met the insured status requirements through June 30, 2015. Tr. 114.

2. Hendricks had not engaged in substantial gainful activity since February 18, 2011, the alleged onset date.  Tr. 114.

3. Hendricks had the following severe impairment: paranoid schizophrenia.[5] Tr. 114-115.

4. Hendricks did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 115-117.

5. Hendricks had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: he can perform only simple to more complex tasks consistent with unskilled to low semi-skilled work (SVP ratings 1-3), he cannot perform fast paced work or

---

[3] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[4] The ALJ's findings are summarized.

[5] The ALJ also concluded that obesity and polysubstance dependence disorder were not severe impairments.  Tr. 115.

work involving strict production quotas, he can adapt to minimal changes in the work setting, he can engage in no more than occasional contact with coworkers and supervisors, and he cannot engage in direct work-related contact with the public.  Tr. 117-121.

6.  Hendricks was unable to perform any past relevant work.  Tr. 122.

7.  Hendricks was born in 1978 and was 32 years old, defined as a younger person age 18-49, on his alleged disability onset date.  Tr. 123.

8.  Hendricks has at least a high school education and is able to communicate in English.  Tr. 123.

9.  Transferability of job skills was not material to the determination of disability.  Tr. 123.

10.  Considering Hendricks's age, education, work experience and RFC, there were jobs that existed in significant numbers in the national economy that Hendricks could perform, including industrial cleaner, file clerk, and mail clerk.  Tr. 123-124.

Based on the foregoing, the ALJ determined that Hendricks had not been under a disability from February 18, 2011, through the date of the decision.  Tr. 124.

## V. Parties' Arguments

Hendricks argues that the ALJ erred in finding his allegations less than fully credible. Doc. 11, pp. 12-15.  Hendricks also argues that the ALJ's Step Five determination is not supported by substantial evidence because the VE hypothetical upon which the ALJ relied did not accurately set forth his limitations.  Doc. 11, pp. 16-18.

In response, the Commissioner argues that the ALJ properly assessed Hendricks's statements regarding the nature and severity of his symptoms.  Doc. 14, pp. 10-17.  The Commissioner also argues that the ALJ relied upon VE testimony provided in response to a hypothetical question that accurately portrayed those limitations that the ALJ found credible and supported by substantial evidence.  Doc. 14, pp. 17-20.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

## A.     The ALJ  properly assessed Hendricks's credibility

Social Security Ruling 96–7p and 20 C.F.R. § 404.1529 describe a two-part process for assessing the credibility of an individual's subjective statements about his or her symptoms.

First, the ALJ must determine whether a claimant has a medically determinable physical or mental impairment that can reasonably be expected to produce the symptoms alleged; then the ALJ must evaluate the intensity and persistence associated with those symptoms to determine how those symptoms limit a claimant's ability to work.

When evaluating the intensity and persistence of a claimant's symptoms, consideration is given to objective medical evidence and other evidence, including: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, received for relief of pain or other symptoms; (6) any measures used to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. § 404.1529(c); Soc. Sec. Rul. 96–7p, *Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 1996 WL 374186, at 3 (July 2, 1996) ("SSR 96-7p").  "An ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.  Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Calvin v. Comm'r of Soc. Sec.*, 437 Fed. Appx. 370, 371 (6th Cir. 2011) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir.1997)).

Consistent with the regulations, the ALJ considered Hendricks's allegations that his mental symptoms, i.e., depression, paranoia, mania, mood swings, anxiety, insomnia, delusions, and visual and auditory hallucinations, were debilitating to the point of not being able to work but concluded that Hendricks's statements as to the intensity, persistence and limiting effects of his symptoms were not credible.  Tr. 118.

In reaching his decision, the ALJ's analysis was not limited to a single piece of evidence. The ALJ considered objective medical findings documented in the medical records showing generally normal or positive mental status examinations.  Tr. 118-119.  Hendricks takes issue with the fact that the ALJ did not specifically note that mental status examinations also reflected poor insight and judgment and did not address evidence showing that Hendricks had difficulty handling stress and maintaining concentration.  Doc. 11, pp. 12-13.  However, an ALJ is not obligated to discuss every piece of evidence.  *Simons v. Barnhart,* 114 Fed. Appx. 727, 733 (6th Cir.2004) ("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.") (internal citations omitted).  Furthermore, the ALJ discussed and considered Dr. Mathew's opinion wherein Dr. Mathew's indicated that Hendricks continued to experience problems with concentration, stress management, social interactions and crowds (Tr. 120 (discussing Exhibit 6F, Tr. 480-482)) and included RFC limitations to account for problems with concentration, stress and social interactions.  Tr. 118.

The ALJ also considered Hendricks's response to treatment, concluding that, when compliant with medication, Hendricks's mental impairment was under control and suggested his ability to remain stable as long as he continued with his medications.  Tr. 119.  Hendricks challenges this conclusion but has not shown that the ALJ's conclusion is unsupported by the record.   For example, Hendricks does not dispute that treatment was helping and improving his symptoms.  Doc. 11, p. 14.   Instead, he simply disagrees with the ALJ's conclusions that, if compliant with his current treatment, his symptoms are not as debilitating as alleged and that he is capable of returning to work based on the RFC assessed by the ALJ.   In essence, Hendricks's argument amounts to a request that this Court weigh and consider the evidence de novo.

However, it is not for this Court to "try the case de novo, nor resolve conflicts in evidence, nor decide questions of credibility." *Gaffney v. Bowen*, 825 F.2d 98, 100 (6th Cir. 1987).

Also, in assessing Hendricks's credibility as to the intensity, persistence and limiting effects of his symptoms, the ALJ considered Hendricks's activities, including spending many hours each day searching for employment; visiting with friends, sketching and drawing, reading, going to movies, traveling to Australia and Pennsylvania.  Tr. 116, 119-120.  Hendricks challenges the ALJ's characterizations and conclusions regarding evidence of his activities.  Doc. 11, pp. 14-15.  However, as indicated above, it is not for this Court to try the case de novo.  *Id.* Additionally, to the extent that the ALJ did not take into account the fact that Hendricks's trip to Pennsylvania was not without stress, Hendricks is mistaken.  As reflected in the decision, when discussing Hendricks's travel, the ALJ specifically noted that the trip to Pennsylvania was a somewhat stressful trip for Hendricks.  Tr. 120.   Hendricks contends that there is no evidence to support the ALJ's conclusion that Hendricks goes to the movies.  Doc. 11, p. 15.  However, there is evidence that Hendricks sees friends on occasion to watch movies.  Tr. 249.  Additionally, even if the evidence does not support the finding that Hendricks goes to theaters to see movies, that finding is not the only reason the ALJ discounted Hendricks's credibility and Hendricks has not shown that the other activities cited by the ALJ are unsupported by the record.  With respect to the ALJ's reliance upon Hendricks's job seeking activity, the ALJ did not rely upon that activity to conclude that Hendricks could in fact work.  Rather, the ALJ relied upon Hendricks's consistent job searching activity as one of many reasons for discounting the credibility of his statements regarding the intensity, persistence and effects of his symptoms.

Here, the ALJ's analysis was not limited to a single piece of evidence and is sufficiently clear to allow this Court to determine whether the ALJ conducted a proper credibility assessment

and whether that determination is supported by substantial evidence.  Soc. Sec. Rul. 96–7p, 1996 WL 374186, at 4.  The ALJ did not ignore or fail to include restrictions in the RFC to account for Hendricks's mental impairments.  Rather, the ALJ concluded that Hendrick's impairments were not as debilitating as he alleged.  Hendricks disagrees with the ALJ's credibility assessment and challenges the ALJ's evaluation of the evidence.  However, Hendricks has not demonstrated that the ALJ's credibility assessment is not supported by substantial evidence. *See Jones*, 336 F.3d at 476 (In reviewing an ALJ's credibility determination, a court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [claimant's testimony] are reasonable and supported by substantial evidence in the record.").

Having reviewed the ALJ's decision, and considering that an ALJ's credibility assessment is to be accorded great weight and deference, the undersigned finds that the ALJ's credibility analysis regarding the severity of Hendricks's mental impairments is supported by substantial evidence.  Accordingly, the undersigned recommends that the Court reject Hendricks's request to reverse and remand the Commissioner's decision on the basis of the ALJ's credibility assessment.

**B.      The ALJ's Step Five determination is supported by substantial evidence**

Hendricks claims that the Step Five determination is not supported by substantial evidence because the VE hypothetical adopted and relied upon by the ALJ did not accurately portray his limitations.  Doc. 11, pp. 16-18.

"In order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments. Hypothetical questions, however, need only incorporate those limitations which the ALJ has

accepted as credible." *Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Hendricks's claim with respect to the Step Five determination is based on his own subjective statements regarding the severity of his symptoms.  However, as discussed above, the ALJ properly assessed Hendricks's credibility.

Hendricks also contends that the ALJ did not properly account for stress caused by his impairments.  However, the ALJ considered the entirety of the record and concluded that Hendricks's symptoms, including his response to stress, would not preclude all work as alleged by Hendricks.  Additionally, the ALJ accounted for problems in responding to stress.  For example, the RFC restricts Hendricks to no fast-paced work and no work involving strict production quotas.  Tr. 118.  Those RFC limitations are supported by the opinion of state agency reviewing psychologist Dr. Warren that was assigned significant weight by the ALJ.  Tr. 121. More particularly, Dr. Warren opined that, although Hendricks does not respond well to stress, he would be able to handle a job where production quotas are not strict and a job where work pace is not rapid.  Tr. 93.   To the extent that Hendricks claims that the ALJ did not consider or account for stress caused by being around other people, whether on a bus or in other public spaces, the ALJ considered those allegations and included RFC restrictions that limit Hendricks's social interactions, including restrictions of no more than occasional contact with coworkers and supervisors and no direct work-related contact with the public.  Tr. 118.

Hendricks also claims that two alternate hypothetical questions – one containing a limitation of no production quotas as opposed to a limitation of no strict production quotas and one containing a limitation that would account for missing 2-3 unscheduled half days – should

26

have been adopted and relied upon by the ALJ.   However, his argument is again based on his own subjective statements as to the limiting effects of his symptoms and the ALJ fully considered those allegations and found them not fully credible.  Thus, the ALJ was not required to adopt or rely on the VE's responses to alternate hypothetical questions that contained limitations beyond those which the ALJ found credible and supported by the record.

Hendricks has not shown that the VE response upon which the ALJ relied to support his Step Five determination was given in response to a hypothetical question that did not accurately portray his limitations.  Thus, the VE's testimony constitutes substantial evidence upon which the Commissioner was entitled to rely to support the finding of no disability.  *See Parks, supra.*

Based on the foregoing, the undersigned recommends that the Court find no error with respect to the ALJ's Step Five determination.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.


December 28, 2016

_____
Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).